**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WONDERLAND NURSERYGOODS CO.,   )
LTD.,   )
  )
  )
        Plaintiff,   )
  )  Civil Action No. 12-196
  )  Judge Nora Barry Fischer
     vs.   )
  )
THORLEY INDUSTRIES, LLC, *d/b/a*   )
4MOMS,   )
  )
        Defendant.   )

## MEMORANDUM OPINION

### I.    BACKGROUND

This is a patent infringement action brought by Wonderland Nurserygoods Co., Ltd ("Wonderland") against Thorley Industries, LLC *d/b/a* 4Moms ("Thorley").   (Docket No. 1). Wonderland filed this case on February 16, 2012, alleging the infringement of U.S. Patent No. 8,047,609 ("the '609 Patent"), entitled "Infant Rocking Chair and Driving Device for Driving the Same." (*Id.* at ¶ 8). The technologies at issue are mechanical driving devices to create an infant chair that moves both up-and-down and back-and-forth. (*Id.*)

Wonderland is a Taiwanese company that designs, manufactures and distributes products for infants and young children. (*Id.* at ¶ 4, 7).  Wonderland is the assignee of the '609 Patent. (*Id.* at ¶ 8).  Thorley is a Pennsylvania corporation, with its offices in Pittsburgh, which makes infant rocking chairs (the "Accused Product") under the brand name "mamaRoo". (Docket Nos. 1 at ¶ 10; 19 at 3)

Thorley asserts five affirmative defenses against Wonderland's infringement claim: failure to state a claim, noninfringement, invalidity, estoppel, and failure to provide notice.

(Docket No. 19 at ¶¶ 15-19).  Thorley asserts counterclaims for non-infringement and invalidity. (*Id.*at 4-5).  Wonderland answers that its patent is valid and infringed.  (Docket No. 21).  It asserts the affirmative defenses of failure to state a claim of non-infringement, (*id.* at ¶ 15), and failure to state a claim of invalidity. (*Id.* at ¶ 16).[1]

On March 14, 2012, the Court denied Thorley's Motion to Stay Proceedings Pending Reexamination of the patent by the USPTO because the Court found that Plaintiff would be unduly prejudiced if this Court were to grant a stay.[2] (Docket No. 23).

Accordingly, the parties filed a "Joint Disputed Claim Terms Chart" pursuant to LPR 4.2 of the Local Patent Rules for the United States District Court for the Western District of Pennsylvania on June 21, 2012.[3] (Docket No. 39).  Opening claim construction briefs, along with exhibits in support, were filed on July 20, 2012 and August 10, 2012 by Wonderland and Thorley, respectively. (Docket Nos. 39-42).   Wonderland filed a reply brief and supporting declarations on August 24, 2012. (Docket No. 43).  On September 6, 2012, the Court ordered the parties to meet and confer to determine if there were any claim terms to which there were no substantive disputes. (Docket No. 44).  Accordingly, the parties filed a corrected "Revised Joint Disputed Claim Terms Chart" pursuant to said order on September 25, 2012.  (Docket No. 46)

As scheduled in the Initial Patent Scheduling Order, a technology tutorial and a *Markman*[4] claim construction hearing were held on September 27, 2012. (Docket Nos. 30, 47).

---

[1]      Paragraph 16 is incorrectly numbered as an additional paragraph 15.  (Docket No. 21)

[2]      The status of the reexamination as of January 11, 2013 is "Ready for examiner action after owner/requester comments period after ACP" (Action Closing Prosecution).  *See* Patent Application 95/001,871.  The Court also notes as this *inter partes* reexamination was filed before September 16, 2012, the America Invents Act does not affect this Court's analysis.  Leahy–Smith America Invents Act, Public Law 112–29 §6(c) ("America Invents Act"); *see also* USPTO AIA Frequently Asked Questions. http://www.uspto.gov/aia_implementation/faqs_inter_partes_reexam.jsp.

[3]      The Local Patent Rules for the United States District Court for the Western District of Pennsylvania can be found at http://www.pawd.uscourts.gov/Documents/Forms/lrmanual.pdf (last updated December 1, 2009).

[4]      *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377-90 (1996).

The transcript of said hearing was filed on November 7, 2012 (Docket No. 51).  Both parties then filed post-hearing claim construction briefs on November 15, 2012.  (Docket Nos. 53, 54).  The parties further met and conferred in accordance with the Court's November 9, 2012 Order; however, as stated in their Joint Status Report filed on November 29, 2012, they were unable to reach agreements on any remaining disputed terms.  (Docket Nos. 52, 57).  As such, this matter is ripe for disposition.

## II.     LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2005)); *see also Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966 (Fed. Cir. 2011), *reh'g denied* (Dec. 7, 2011); *N.A. Water Sys., LLC v. Aquatech Int'l Corp.,* 2012 WL 3597825 (W.D. Pa. Aug. 20, 2012).   In patent infringement litigation, the court is to first determine, as a matter of law, the proper construction, or meaning, of the disputed patent claims. *Id.*   Once the claim terms have been properly construed, the fact finder must then determine whether the accused product or method infringes the asserted claims as so construed. *See Markman,* 517 U.S. 370.

The decision by the United States Court of Appeals for the Federal Circuit in *Phillips* provides a blueprint for the court's claim construction analysis:

> A court construing a patent claim seeks to [afford] a claim the [ordinary and customary] meaning it would have to a person of ordinary skill in the art at the time of the invention....
>
> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction ... involves little more

than the application of the widely accepted meaning of commonly understood words ....

In many cases ..., however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art.  Because the meaning ... as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean ....  Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art ....

Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction ....  We have especially noted the help ... technical dictionaries may provide to a court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms ....  Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art .... Such evidence, we have held, may be considered if the court deems it helpful in determining the true meaning of [the] language used . . . .

[Although] ... extrinsic evidence in [a] general [sense is] less reliable than [intrinsic evidence] in determining how to read claim terms, .... encyclopedias and treatises [can be] particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms [so long as they are considered within the context of the intrinsic evidence].

*Phillips,* 415 F.3d at 1303, 1313, 1314, 1318-19 (citations and internal quotations omitted).

In looking to the intrinsic evidence, the court considers the language of the claim, the specification and the prosecution history. *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The claim itself is of primary importance since "it is that language that

the patentee chose to use to 'particularly point[ ] out and distinctly [ ]  claim the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (Fed. Cir. 2000) (quoting 35 U.S.C. § 112, ¶ 2).  However, the Federal Circuit advises in *Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005), that "[w]e cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."

Next, the Court must look to the specification in the patent.  As to the specification, the Federal Circuit has stated that it "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of the disputed claim." *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1315; *Zircon,* 452 Fed. Appx. at 972. The Federal Circuit states that "it is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips***,** 415 F.3d at 1317.  However, the Federal Circuit cautions that there is a danger in reading limitations from the specification into the claim. *Id.* at 1323 (citing *Comark Communications, Inc. v. Harris Corp*., 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification")). While the specification may be the best guide in interpreting a disputed term, the court must be careful to use the specification only to ascertain its meaning and not to impose a limit on a claim term. *Id.; see also Abbott Lab. v. Sandoz, Inc.,* 566 F.3d 1282, 1288 (Fed. Cir. 2009) (courts may not limit broad claim language to that described in even a single embodiment absent a clear intention by the patentee to so limit the claim scope); *Karlin Technology, Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 973 (Fed. Cir.

1999) ("The general rule . . . is that the claims of a patent are not limited to the preferred embodiment" of the invention described in the specification).

The final piece of intrinsic evidence which the Court may consider is the prosecution or file history. *Zircon,* 452 F. App'x. at 972. The prosecution history "consists of all express representations made by or on behalf of the applicant to the [patent] examiner to induce a patent grant." *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (internal quotations and citations omitted).  The prosecution history, therefore, can provide some insight into the scope of the invention, as understood by the inventor and the USPTO, as well as whether that scope is narrower than the claim language would otherwise indicate. *Phillips*, 415 F.3d at 1317.  A caveat to the use of the prosecution history is that it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*.  As a result, in order for a limitation of the scope of the claims to be read from the prosecution history, the inventor must have made a "clear and unmistakable disavowal" of a broader scope of protection during prosecution. *See Purdue Pharma L.P. v. Endo Pharms. Inc*., 438 F.3d 1123, 1136 (Fed. Cir. 2006).

If the meaning of a claim's terms cannot be ascertained through interpretation of the intrinsic evidence a court may look to extrinsic evidence, "which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d 967, 980 (Fed. Cir. 1995)); *see also Zircon,* 452 F. App'x. at 972; *N.A. Water Sys.,* 2012 WL 3597825.  Although extrinsic evidence "can shed useful light on the relevant art," such evidence is less significant in defining a claim term than intrinsic evidence. *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp*., 388 F.3d 858, 862 (Fed. Cir. 2004) (internal

quotation omitted)).  This is because "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term," and "[i]n such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583.  Therefore, extrinsic evidence "may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language" or the other intrinsic evidence. *Id*. at 1584.

## III.   ANALYSIS

The '609 Patent, entitled "Infant Rocking Chair and Driving Device for Driving the Same", was filed on June 28, 2007 and issued on November 1, 2011. '609 Patent col. 1. ln. 1-12. The terms still in dispute are:  (A) "infant rocking chair"; (B) "bottom seat"; (C) "motor shaft"; (D) "crank"; (E) "guiding elements; (F) "connected fixedly" and "attached fixedly". (Docket Nos. 46, 57).  The Court will now construe each of these terms, in turn.

### A.  Infant Rocking Chair

The parties dispute the construction of the term "infant rocking chair" found in the preamble to claims 1, 12, and 19.  (Docket No. 46).  The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| infant rocking chair (claims 1, 12, 19) | a **baby seat or chair-like**[2] device that is designed to hold an infant and that moves in two directions at the same time. | The titles, abstracts and figures of art cited and relied upon by the Examiner in the original prosecution, i.e., US 5,123,701 US 5,183,457 US 496,531 US 2002-0113469 US 2006-0012230 | | a <u>seat or chair-like</u> device that is capable of holding an infant which moves or sways back and forth. | Patent-in-Suit: 1:15-42; 4:66-5:4; 5:53-6:10. Feb. 14, 2012 Office Action in the reexamination at pgs. 2-3, 5, and 10. |

(Docket No. 46).

The Court addresses the following arguments: (1) whether the disputed term is a limitation on the claims since it is found in the preamble; (2) whether the "chair" must be designed to hold an infant or just be capable of holding an infant; and (3) whether the "chair" must move in two directions at the same time. (*Id.*).

    1.  <u>Preamble Language</u>

Claims 1 and 19 both start with preambles stating: "A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising:…". '609 Patent col. 6. ln. 47-50; col. 8. ln. 39-41. Correspondingly, Claim 12's preamble starts "An infant rocking chair comprising…". '609 Patent col. 7. ln. 58.

Wonderland argues that the preamble defines two important components of the invention the "seat body" and the "bottom seat". '609 Patent at col. 1, ln. 48-50 and col. 8, ln. 39-41. Wonderland also insists that the term "infant rocking chair" is not background information; rather, it is the "antecedent basis for two essential components of the infant rocking chair, the 'seat body' and the 'bottom seat'" and is, therefore, limiting. (Docket No. 43 at 1- 4).

On the other hand, Thorley claims that the preamble terminology is not limiting because the body of Claims 1 and 19 refer to the "<u>driving device</u> for use in an infant rocking chair." (Docket No. 41 at 8) (emphasis added). Thorley asserts that this driving device is not dependent on the "infant rocking chair" language, as it explains the device's intended use or purpose. (*Id.*). Additionally, Thorley contends that the body of Claim 12, which follows the word "comprising," offers a complete invention without reference to the preamble. (*Id.* at 9).

A preamble to a claim may be a limitation if it recites a limitation or is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Such limitation is "determined on the facts of each case in light of

the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Deere & Co. v. Bush Hog, LLC*, 2012 WL 6013405 (Fed. Cir. Dec. 4, 2012) (internal citations omitted).   "No litmus test defines when a preamble limits claim scope," but "[i]n general, a preamble limits the claimed invention if it recites essential structure or steps, or if the preamble is used in the prosecution history to limit the scope of the claim." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1347 (Fed. Cir. 2002). The preamble is not regarded as limiting when the patent claim otherwise describes a complete invention, when the preamble is merely duplicative of limitations in the body, or when it operates only as an introduction to the general field of the invention. *See, e.g., Am. Med. Sys., Inc. v. Biolitic, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir. 2010) (preamble not limiting if the patent "describes a structurally complete invention in the claim body and uses the preamble only to state a purpose…"); *Symantec Corp. v. Computer Associates Int'l., Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008); *Hearing Components, Inc. v. Shure, Inc.*, 600 F.3d 1357, 1366 (Fed. Cir. 2010) (preamble not limiting when it is "simply an introduction to the general field of the claim.") The Federal Circuit recently stated that a limiting preamble term is one that describes a "fundamental characteristic of the claimed invention" that informs one with skill in the art as to the structure required by the claim.  *Deere & Co.,* 2012 WL 6013405 at *7 (holding that in a patent disclosing an "easy clean dual wall deck" for a rotary cutter, the preamble phrase, "rotary cutter deck" was a limitation as it was necessary to understand the subject matter encompassed by the claim; the specification also repeatedly referred to the "present invention" as "an improved deck for a rotary cutter," or a "rotary cutter deck"; and the title of the patent, the summary of the invention, and every drawing described the invention as a deck for a rotary cutter.)

In this instance, the Court finds the preamble language limiting. The term "infant rocking chair" is referred to as the antecedent basis for certain elements of the claim body. Without the preamble language, there is no seat body or bottom seat of the "infant rocking chair" to which the various claim elements attach. '609 Patent col. 6. ln. 47-50; col. 8. ln. 39-41; col. 7. ln. 58. Recitation of "infant rocking chair" in Claims 1, 12, and 19 is necessary to understand the subject matter encompassed by the claim. *See Deere & Co.*, 2012 WL 6013405, at *7. While Thorley argues the claims are directed at the driving device only, the intrinsic evidence plainly demonstrates that the claims are directed at both the driving device and rocking chair. To this end, pertinent intrinsic evidence is that: the title of the patent is "<u>Infant Rocking Chair</u> and Driving Device for Driving the Same," 12 of the 15 figures show the "chair" feature and the summary of the invention includes the description of the "infant rocking chair". (Docket No. 53 at 5); '609 Patent col. 1. ln. 1 (emphasis added); ln. 39-41. Even considering the driving device alone, the patent shows that the driving device does not just happen to be used in infant rocking chairs; its fundamental purpose is to provide motion that mimics a person holding an infant in his or her arms, "resulting in <u>infant</u> comfort". 609 Patent col. 1. ln. 20-38; (Docket No. 51 at 56). Thus, the preamble term, "infant rocking chair" "give[s] life" to the claim and shall be considered limiting. *Pitney Bowes, Inc.* 182 F.3d at 1305.

Having found the term "infant rocking chair" limiting, the Court now construes the term in light of the parties' competing arguments.

2.   <u>"Infant Rocking Chair" as Capable or Designed to Hold an Infant</u>

Wonderland maintains that an "infant rocking chair" should be <u>designed</u> to hold an infant, not merely capable of holding an infant "so long as one could set an infant on it." (Docket No. 43 at 7). In support, Wonderland offers examples of inventions that could conceivably fit

Thorley's proposed definition of "a seat or chair-like device capable of holding an infant…" (*Id.*).   These examples include a barber chair, a motion simulator chair, a drafting stool, and a circular saw feeder.[5] (*Id.;* Docket No. 54 at 1-3*).*

Thorley counters that to the extent "infant rocking chair" is limiting, it should be defined only as <u>capable</u> of holding an infant.  Thorley points out that its proposed definition was supported by the Examiner during the reexamination.  (Docket No. 53 at 6).[6]  Thorley also argues that "infant" is ambiguous and undefined. (Docket No. 46; 51 at 32 ln 17-25) ("And then what is an infant rocking chair? I mean how -- how old does the kid have to be? How much does it have to weigh?  What is the height?")

The Court disagrees with Thorley that the term "infant" is ambiguous, as it takes its ordinary meaning.[7]  In this case, where the ordinary meaning to all, whether or not skilled in the art, is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Joy MM Delaware, Inc. v. Cincinnati Mine*

---

[5]      The circular saw feeder was a more appropriate example when Thorley's proposed definition was "a device that is capable of holding an infant…" (Docket Nos. 36, 46). This definition was later amended in the Revised Joint Disputed Claims Chart.  (*Id.*).

[6]      The examiner stated that an "infant rocking chair" "must at least be capable of seating an infant."  (Docket No. 41-1 at 51).  In considering comments made by the examiner during the reexamination process, the Court is mindful that "PTO examination procedures have distinctly different standards, parties, purposes, and outcomes compared to civil litigation". *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008) (internal citations omitted).  As the Federal Circuit holds, "in reexamination proceedings, claims are given their broadest reasonable interpretation, consistent with the specification." *Id.* at 1378-1379.  Therefore, "considering an issue at the district court is not equivalent to the PTO having had the opportunity to consider it." *Id.* at 1378-1379; *see also In re Baxter Int'l, Inc.,* 678 F.3d 1357, 1361 (Fed. Cir. 2012).

[7]      As the Court indicated in hearing this matter, to the extent any product is considered an "infant" chair, government regulation is extrinsic evidence of its ordinary meaning.  (Docket No. 51 at 32-33).  To that end, the Court takes judicial notice that infant products, such as the rockers in suit, are regulated by the U.S. Consumer Product Safety Commission, a fact those in this industry and field of art would be well aware. 15 U.S.C.A. § 2056a; FED. R. EVID. 201; *Estate of Patterson v. City of Pittsburgh*, CIV.A. 11-1021, 2011 WL 4860003 (W.D. Pa. Oct. 13, 2011); *Caha v. United States*, 152 U.S. 211, 222 (1894); *Cotapaxi Custom Design & Mfg., LLC v. Corporate Edge, Inc*., CIV A 06-5183 (JAG), 2007 WL 2908265 (D.N.J. Oct. 1, 2007) *aff'd,* 284 F. App'x 809 (Fed. Cir. 2008) (taking judicial notice of the two patent drawings).  Under these safety standards the term "durable infant or toddler product" is "a durable product <u>intended for use, or that may be reasonably expected to be used,</u> by children under the age of 5 years," and includes high chairs, infant carriers, swings, bassinets, and cradles among others. 15 U.S.C.A. § 2056(a) (emphasis added).

*Mach., Co.,* 2012 WL 5439885 (Fed. Cir. Nov. 8, 2012).  Therefore, the Court finds Thorley's definition inappropriate, as almost any seat or chair is <u>capable</u> of holding an infant dependent on the size of seat or chair and the size of the infant.  Because a chair could possibly hold an infant, such a chair is not an "infant chair."  Instead, the Court is persuaded that "infant rocking chair" means a seat or chair-like device <u>designed for</u> infants, as Wonderland suggests.  Moreover, this construction, the parties' agreement on "seat or chair-like device," and the use of the term "infant" throughout the '609 patent, make Wonderland's proposed addition of the word "baby" before "seat" unwarranted.

        3.  <u>Movement of an "Infant Rocking Chair"</u>

Regarding the movement of an "infant rocking chair," Wonderland submits patents U.S. 5,123,701, U.S. 5,183,457, U.S. 496,531, U.S. 2002-0113469, and U.S. 2006-0012230 that the Examiner cited and relied upon in the original prosecution filing. (Docket No. 37).  These five patents generally show devices that move across a curved surface to create a rocking movement. (Docket No. 39 at 7-8).  Wonderland claims that such rocking action is movement in two directions. (*Id.*).  Wonderland illustrates the two directional movement of a "conventional rocking chair" as follows:



(Docket No. 43 at 10).

On the other hand, Thorley contends Wonderland contradicts its own definition in the background of the '609 patent, which states that conventional infant rocking chairs can only move in one direction. (Docket No. 41 at 10). Wonderland counters that only "conventional infant rocking chairs" move in one direction and that its invention is not covered by such a definition. (Docket No. at 43 at 8). However, this statement is immediately contradicted by Wonderland's explanation (using an illustration of a traditional rocking chair) of how rocking chairs move in two directions at the same time as seen above. (*Id*. at 9, 10)

Secondly, Thorley argues that because the patent repeatedly states the invention can be locked to move in only one direction, the '609 Patent negates the notion that an "infant rocking chair" must move in two directions. (Docket No. 41 at 10; 53 at 7); '609 Patent col. 1 ln. 39-41; col. 4 ln. 66-col. 5 ln. 4; col 5 ln. 53-57; col. 8 ln. 33-38. Thorley further proffers the dictionary meaning of "rocking" defined as "to move back and forth." (Docket No. 42 at 8; Ex. A).

Given the multiple intrinsic references within the claims, and the plain understanding of the term "rocking," the Court does not find the need to limit rocking chairs to those that move in two directions at the same time. Such a limitation is unfounded and contradicted by evidence from the patent, as well as by common sense. Using this part of Thorley's definition ("which moves or sways back and forth") does not exclude chairs that move in two directions as Wonderland contends.

### 4. Construction

Accordingly, the Court concludes that the construction of the preamble term "infant rocking chair" is as follows:

**Infant Rocking Chair** means "a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth."

### B.  Bottom Seat

The parties next dispute the construction of the term "bottom seat" found in claims 1, 12, and 19.  (Docket No. 46).  The parties' proposed constructions are as follows:

| Term | Wonderland (Modified)[1] | | AGREED CONSTRUCTION | Thorley (Modified)[1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| bottom seat (claims 1, 12, 19) | a generally planar structure with substantial surface area at the bottom of an object upon which the object sits or rests capable of cooperating with a cover to form a chamber. | '609 patent at Col 5, lines 15-21 + Figs. 1, 2 and 11 | | a structure at the bottom of an object upon which the object sits or rests. | Patent-in-Suit: Figures 1, 2, 7 and 11. April 16, 2012 Patent Owner Response in the reexamination, at pgs. 6 and 22. |

(Docket No. 46).

Claims 1 and 19 both state: "A driving device for an infant rocking chair, the infant rocking chair including a seat body and a <u>bottom seat</u>, said driving device comprising:…" '609 Patent col. 6. ln. 47-50; col. 8. ln. 39-41 (emphasis added).  Claim 12's preamble starts: "An infant rocking chair comprising: a seat body; a <u>bottom seat</u>…".  '609 Patent col. 7. ln. 59-61 (emphasis added).

Wonderland offers the Webster's Ninth New Collegiate Dictionary definitions of both "seat" and "bottom" along with the language of the claim to infer that "bottom seat" is defined as planar and having a substantial surface area.[8]  (Docket No. 39 at 10).  Wonderland argues that the specification and figures describe the planar nature and substantial surface area of the "bottom seat." (Docket No. 43 at 10-12; 54 at 7). It further explains that this feature is required to accommodate a "cover body", element 13, to form a "chamber", element 14, as shown below in Figure 6.[9]  (*Id.*).

---

[8]     The proffered Webster's definition of "seat":  "5. a: a part at or forming the base of something". (Docket No. 39 at Ex. 3)  The proffered Webster's definition of "bottom": "1. b: a surface designed to support something resting on it".  (Docket No. 39 at Ex. 3)

[9]     Neither "cover body" nor "chamber" are disputed terms.



'609 Patent Fig. 6.  In its post hearing brief, to support the proposition of a planar structure, Wonderland offers the definition of "seat" and "base" from freedictionary.com.[10]  (Docket No. 54 at 5).

Thorley counters that the patent does not state that the "bottom seat" needs to be planar or with substantial surface area.  (Docket No. 41 at 14).  Thus, the definition additions proffered by Wonderland are, at most, an inference based on the patent's figures. (*Id.*).

As held in *Abbott Lab.* 566 F.3d at 1288, the Court should not limit claim language from the specification absent a clear intention by the patentee to so limit the claim scope.  In this Court's opinion, the claims do not contain the requirements that the "bottom seat" have a "generally planar structure", "with a substantial surface area".  In fact, the figures that show such embodiments do not demonstrate a <u>clear</u> intent to limit the scope of the claims.  *See* '609 Patent

---

[10]	The proffered freedictionary.com's definition of "seat":  "5. a: a part serving as the base of something else; b: the surface or part on which another part sits or rests." (Docket No. 54 at 5).  The proffered freedictionary.com's definition of "base": "3. a: a supporting part or layer; a foundation".  (Docket No. 54 at 6).

Figures 1, 2, and 11.  Without this limitation, the parties agree that a "bottom seat" is "a structure at the bottom of an object upon which the object sits or rests".

<u>Construction</u>

Therefore, the Court concludes that the construction of the term "bottom seat" is as follows:

**Bottom Seat** means "a structure at the bottom of an object upon which the object sits or rests."

## C.  Motor Shaft

The parties next dispute the construction of the term "motor shaft" found in claim 1. (Docket No. 46).  The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| motor shaft (claim 1) | a component which rotates to transfer power from the motor. | Patent-in-Suit: Fig. 12 and the corresponding description of the "vertical motor shaft" at Col. 4, lines 50-55. | | a cylindrical piece that is part of the motor which rotates to output power from the motor. | Patent-in-Suit: 2:56-3:13; 4:50-65; 5:22-40; Figures 1, 2-5, and 7-15. |

(Docket No. 46).

Claim 1 states: " A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising: …a motor for driving said first movable member, wherein said motor includes: a <u>motor shaft</u>, …".  '609 Patent col. 6. ln. 47-61. (emphasis added)

The disputes are (1) the shape of the "motor shaft" (must it be cylindrical) and (2) the source of the "motor shaft" (does it come <u>from</u> the motor or is it <u>part</u> of the motor). (Docket No. 46).  Wonderland contends that "motor shaft", as used in claim 1 of the '609 patent, is a "component which rotates to transfer power <u>from</u> the motor."  (Docket No. 39 at 22) (emphasis

added).   Thorley offers that it is a "<u>cylindrical</u> piece that is <u>part</u> of the motor which rotates to output power from the motor."  (Docket No. 41 at 29) (emphasis added).

### 1.   Shape of the "Motor Shaft"

Wonderland maintains that shafts "come in all sizes and shapes, including round, square, and hexagonal". (Docket No. 43 at 21).  It then offers a sampling of patents with "motor shafts" that are triangular, square, pentagonal, hexagonal, heptagonal, and octagonal. *See, e.g.,* U.S. Pat. No. 7,739,870 at col. 18 ln. 31-33 (Exhibit 14), ln. 55-59 and Figure 4; U.S. Pat. No. 7,722,344 at col. 2, ln 67-col. 3 ln 55 and Figures 2-7 (Exhibit 15).  Wonderland does not add to its position on this dispute in its post-hearing brief. (Docket No. 54).

In reply, Thorley insists that the "motor shaft" is a cylindrical piece as displayed in Figure 1.  Thorley also avers that it must be cylindrical by necessity, since the claim states the "motor shaft" rotates while fixed to a crank at one end.  (Docket No. 41 at 25) ('609 Col. 6 ln. 61-66) ("crank connected fixedly to said motor shaft at one end thereof").  Thorley also offers Webster's Dictionary and McGraw-Hill Dictionary of Scientific Terms definitions as extrinsic evidence that a "motor shaft" is "cylindrical" by definition.  (Docket No. 41-1 Ex. A at 10; Ex. B at 4).  Since Wonderland had previously argued for "generally planar" with respect to the term "bottom seat", the Court inquired if Wonderland could agree to "generally cylindrical".  (Docket No. 51 at 86).  Wonderland's counsel represents that while "in [his] experience geometrical terms like cylindrical and planar can be extremely specific and extremely limiting"…patent authors thus "often put in a softer, if you will, in the form of the word 'generally'", in this instance Wonderland could not agree to  using "generally" and maintained that "cylindrical is out." (*Id.*).   In its post-hearing brief, Thorley confirms it is amenable to the term "generally cylindrical".  (Docket No. 53 at 12).

2.   Location of the "Motor Shaft"

Wonderland states that the "motor shaft" in the '609 patent is not part of the motor as evidenced by Figures 1, 11, 12 as well as Col. 4, lines 50-55.  (Docket No. 39 at 21).  Instead, the "motor shaft" is a vertical component separated from the motor by a series of gears as seen in Figure 12. (*Id.)* (as annotated by Wonderland).



**Fig. 12 (partial + annotated)**

(*Id.* at 22).  Additionally, since the claim states that "said motor includes… a crank … and a link," both of which are obviously not "part of" the motor in Wonderland's view, the phrase "the motor includes..." was intended "to mean that the recited structures are merely associated with the motor, and not "part of" the motor." (Docket No. 43 at 23).

Thorley believes that the Court should look at the words of the claims to prove that a "motor shaft" is part of the motor.  (Docket No. 41 at 26-29).  Thorley offers Claim 1 which reads "wherein said motor includes: a motor shaft." '609 Patent at col. 6. ln 60-61.  Next, it cites the specification which reads "a variable speed motor including a vertical motor shaft." '609 col 4. ln 50-51.  Finally, Thorley maintains that Wonderland's definition is overbroad since "components which rotate[ ] to transfer power from motor" could conceivably include the crank, the threaded rod, and even the gears.  (Docket No. 41 at 28).  All of which it posits are

components the author of the '609 Patent considered as separate elements, and never labeled as "motor shafts". (*Id.*).

The Court observes that Wonderland's position regarding "motor" does not appear to be supported.   In its annotation of Figure 12, Wonderland asserts that "power mechanism" and "motor" are synonymous.   Throughout the specification, "6" is called either a "power mechanism" or "motion mechanism." '609 Patent col. 4. ln 50-col 5. ln 7; col 5 ln 29; col 5 ln 43;   col 5 ln 59; col 6 ln 11; col 6 ln 38-40.   The only use of the word "motor" in the specification is in the description of the first preferred embodiment wherein the "power mechanism 6 is configured as a variable speed motor including a vertical motor shaft 60". '609 Patent col. 4. ln 50-51.   Figure 12 shows the third preferred embodiment, and there is no use of the word "motor" in its description. '609 Patent col. 6. ln 15-40.  Further, while claim 1 uses the term "motor," claims 8 and 9 use the term "power mechanism."   '609 Patent col. 6. ln 60; col. 7 ln. 36-49. Keeping in mind the doctrine of claim differentiation, which holds that "there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims," the Court observes that "motor" and "power mechanism" are used in different contexts.  *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.,* 637 F.3d 1324, 1335 (Fed. Cir. 2011). Hence, as claimed, the "motor shaft" is part of the "motor", but distinct and independent from the "power mechanism".

3.  Analysis

The Court finds that the intrinsic evidence of the claims, specification, and figures depict the "motor shaft" in the '609 Patent as cylindrical.  However, the Court is mindful that it should "not limit broader claim language to that single application 'unless the patentee has demonstrated

a clear intention to limit the claim scope.'" *Abbott Lab.,* 566 F.3d at 1288.   Both parties bring before the Court extrinsic evidence to support their respective theories, which the Court considers secondary to the intrinsic evidence of the patent.  (Docket No. 41, 43).  The Court finds that while a "motor shaft" need not be cylindrical *per se*, there needs to be a physical descriptor of the component in the claims, or the term "motor shaft" could reasonably include any device that happens to rotate.  Thus, the Court modifies the term "cylindrical" to "generally cylindrical," agreeing with Wonderland's counsel that the use of term "generally" can be a "softener" to strict geometric terms.  (Docket No. 51 at 86 lines 12-20).  Again, Thorley does not oppose the use of the term "generally cylindrical."  (Docket No. 53 at 12).   Since the term is not just "shaft" but "motor shaft", the Court also finds that the construction of "motor shaft" should express the component's proximity to the motor.  On this, Wonderland's definition is too broad, possibly covering any component that transfers power, no matter how distant from the motor. The Court, therefore, adopts Thorley's definition, which is consistent with Claim 1 and the specification.  '609 Patent col 4. ln 50-51; col. 6 ln 60-61 ("wherein said motor includes: a motor shaft" and "a variable speed motor including a vertical motor shaft").

4.  Construction

As a result, the Court concludes that the construction of the term "motor shaft" is as follows:

**Motor Shaft** means "a generally cylindrical piece that is part of the motor which rotates to transfer power from the motor."

**D.  Crank**

The parties next dispute the construction of the term "crank" found in claim 1.  (Docket No. 46).  The parties' proposed constructions are as follows:

| Term | Wonderland (Modified)[1] | | AGREED CONSTRUCTION | Thorley (Modified)[1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| crank (claim 1) | a device or part of a device for communicating motion or for converting reciprocating motion into rotary motion or vice versa. OR a link in a mechanical linkage or mechanism that can turn about a center of rotation. | Patent-in-Suit: Col. 4 line 55-57 | | an arm attached at a right angle to a shaft which turns about the axis of the shaft. | Patent-in-Suit: 2:56-3:13; 4:50-65; 5:22-40; Figures 1, 2-5, and 7-15. |

(Docket No. 46).

Claim 1 states: "A driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising: … a motor for driving said first movable member, wherein said motor includes: a motor shaft, a <u>crank</u> connected fixedly to said motor shaft at one end thereof, …" '609 Patent col. 6. ln. 47-62; (emphasis added).

Wonderland proposes a broad construction of "a device converting rotary motion into reciprocating motion." (Docket No. 46).  It supports this position with extrinsic dictionary definitions from Dictionary.com as well as Webster's Unified Dictionary and Encyclopedia.[11] (Docket No. 39 at 23-24; Ex. 2; Ex 3).  Wonderland offers the Hierapolis Sawmill as an example of a non-right angled arm "crank".  (Docket No. 43 at 26).  As a compromise in the Revised Joint Claims Chart, Wonderland proposes its second option for the definition of "crank" derived from the McGraw-Hill Dictionary of Scientific and Technical Terms. (Docket No. 43 at 27; Docket No. 45).  In its post-hearing brief, Wonderland also submits mechanical engineering treatises, *Design of Machinery* by Robert L. Norton and *Marks' Standard Handbook for Mechanical*

---

[11]      Dictionary.com definition of "crank": "1. *Machinery.* any of several types of arms or levers for imparting rotary or oscillatory motion to a rotating shaft, one end of the crank being fixed to the shaft and the other end receiving reciprocating motion from a hand, connecting rod, etc."  (Docket No. 39 at 23; Ex 2).  Webster's Unified Dictionary and Encyclopedia definition of "crank": "*n.* 1.  A device for turning rotary motion into back-and-forth motion, or vice versa.  2. A bent handle, fixed or detachable, for turning things, as the crank of an automobile engine…" (Docket No. 39 at 24; Ex 3).

*Engineers*, to support its position that a "crank" can take any form. (Docket No. 54 at 9-11; Ex. 1; Ex. 2).

In reply, Thorley contends that a "crank" is a device with an arm attached at a right angle and offers the Merriam Webster definition of "crank" as evidence.[12] (Docket No. 41 at 29). Thorley also argues that the '609 Patent figures prove that a "crank" is attached at a right angle. (*Id.* at 30).  In its post-hearing brief, Thorley maintains that Wonderland's proposed definition is overly broad, contrary to the ordinary meaning, and unsupported by the intrinsic evidence. (Docket No. 53 at 17-18).

Upon review, the Court finds Wonderland's extrinsic evidence unconvincing. Specifically, the Hierapolis Sawmill is not only dated (the Sawmill dates back to the 3rd century), but in the proffered picture, the "crank" appears to contain a right angled arm. (Docket No. 43 at 26).  *See* Wikipedia, *Crank,* http://en.wikipedia.org/wiki/Crank_(mechanism) (last visited January 10, 2013).  Ironically, at the top of this article it states that "[a] crank is an arm attached at right angles to a rotating shaft by which reciprocating motion is imparted to or received from the shaft." *Id.*

Wonderland's second definition imposes the term "link," which offers little clarification of the term in question, "crank," and is already a term used elsewhere in the patent. '609 Patent col. 6. ln. 64.  The distinction Wonderland attempts to show in its reliance on the *Norton Engineering* treatise is unclear, as the treatise points to the arms as the "crank", not the entire disk as Wonderland appears to urge.  (Docket No. 54 at Ex. 1).  Further, *Mark's Standard's*

---

[12]       Wonderland in its reply brief accuses Thorley of dictionary shopping, using an array of dictionaries throughout its brief to choose the best definition available. (Docket No. 43 at 26-27).   While this is frowned upon, both parties have used multiple dictionary resources throughout their briefs and the Court considers them only as extrinsic evidence secondary to the intrinsic evidence presented. (Wonderland:  Dictionary.com, Webster's Ninth New Collegiate Dictionary; Webster's Unified Dictionary; Thorley: Merriam-Webster's Collegiate Dictionary, McGraw-Hill Dictionary of Scientific and Technical Terms.)  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1322 (Fed. Cir. 2005)("A claim should not rise or fall based upon the preferences of a particular dictionary editor…").  (Docket Nos. 40, 42).

definition is at least one degree removed, as it defines "links" not "cranks." (*Id.* at Ex. 2).  Even

considering these two additional resources, the Court agrees with Thorley that in light of its use

in the patent and the ordinary meaning, a "crank" is an <u>arm</u> attached at a right angle to the

rotating shaft.  '609 Patent col. 4. ln. 51-53; col. 5 ln. 27; Figure 7.

<u>Construction</u>

Thus, the Court concludes that the construction of the term "crank" is as follows:

**Crank** means "an arm attached at a right angle to a shaft which turns about the axis of

the shaft."

### E.  Guiding Elements

The parties next dispute the construction of the term "guiding elements" found in claims

2, 3, 13, 14, and 20.  (Docket No. 46).  The parties' proposed constructions are as follows:

| Term | Wonderland (Modified)[1] | | AGREED CONSTRUCTION | Thorley (Modified)[1] | |
| --- | --- | --- | --- | --- | --- |
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| guiding elements (claims 2, 3, 13, 14 and 20) | a set of pathways which control <u>or direct</u> movement. | The use of the term "guide path unit" in other claims (e.g., 1, 2, 4-6,8,9,11,19 and 20) | | a set of tracks forming a predefined path which direct movement. | Patent-in-Suit: 4:21-49; 4:66-5:14; 5:41-64; Figures 1, 2-5, and 7-15. |

(Docket No. 46)

Wonderland and Thorley's dispute centers on whether the term "guiding elements" refers

to a set "of <u>pathways</u>" or a "set of <u>tracks forming a predefined path</u>".  (*Id.*).

Wonderland believes that "pathways" is the correct construction, because it is a

component of the undisputed term "guide path unit", "wherein said guide path unit includes a

pair of spaced-apart guiding elements."  '609 Patent. col 7. ln 2-3; (Docket No. 39 at 25).

Thorley refutes the use of "pathways" since the specification and figures identify the "guiding

elements" as a set of "parallel guiding rods".  (Docket No. 41 at 33); '609 Patent col. 4. ln 23-25;

col. 5. ln 41-42; Figure 7, element 81. Thorley then argues that "a 'pathway' is typically

understood to reference the course or path itself." (*Id.* at 34*)*.  Hence, it suggests that the term in question is directed "to the <u>elements</u> which <u>guide</u> the moveable members along this path or course." (*Id.*). Wonderland insists that while the '609 Patent only shows rods, a Court should not limit a claim "to its preferred embodiment simply because that is all that is shown." (Docket No. 43. at 28).   At the hearing and in its post-hearing brief, Wonderland reiterates that the Court should use the term "path" in its construction since it appears in the specification and the claims of the '609 Patent.  (Docket No. 54 at 12).   In response, Thorley posits in its post-hearing brief that Wonderland's proposed definition as "a set of pathways" would not even cover the guiding rods disclosed in the '609 patent.  (Docket No. 53 at 21).

This term is disputed because the Accused Product does not use "rods" like the '609 Patent, but instead uses "wheels turning on a flat surface". (Docket No. 43 at 28); (Docket No. 1 at Ex. B).   Wonderland contends that these flat "bearing surfaces" guide the vertical motion mechanism and, therefore, fall under the term "guiding elements."[13] Wonderland further insists that Thorley is judicially estopped from contending that "flat bearing surfaces on which wheels roll" are not "guiding elements", since it argued the opposite in its successful request for USPTO reexamination of the '609 Patent.  (Docket No. 43 at 28).

Judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).   The focus of this decision, however, is claim construction. In construing terms, the Court considers the claims, specification, and plain meanings of same, before considering such extraneous arguments.[14]   *See Phillips* 415 F.3d 1303.

---

[13]      This argument is best left for the infringement phase of this case.

[14]      To the extent that Wonderland would press judicial estoppel, the Supreme Court listed the primary factors for determining whether it should apply, the first being that a party's later position must be "clearly inconsistent" with its earlier position. *New Hampshire* 532 US at 750-51.  Even if this Court considers judicial estoppel based on

In the Court's estimation, the author of the '609 Patent uses the terms "guide path unit" to express the idea of a guided path. Therefore, the term "guiding elements" refers to the actual pieces that make up that "unit." The intrinsic evidence of the '609 specification and most figures persuade the Court that the preferred embodiment of the invention has the "guiding elements" as rods. '609 Patent Figures 1-5, 7-15. However, in the claims themselves, the term "rods" is not used; rather, the term, "guiding elements" is the chosen term. '609 Patent claims 2, 3, 13, 14, and 20. As noted earlier, the Court should "not limit broader claim language to that single application unless the patentee has demonstrated a clear intention to limit the claim scope." *Abbott Lab.*, 566 F.3d at 1288 (internal citations omitted). With the use of the term "guiding elements" instead of "rods" in the claims, there does not appear to be a clear intent to limit the claim scope to "rods" alone. The Court, thus, agrees with Thorley that construing the term "guiding elements" as a set of "tracks" is appropriate to define the physical components of the "guide path unit," but allows for a broader definition beyond the embodied parallel rods.

Both parties in the Revised Joint Claim Construction Chart have agreed to use "direct movement" as part of this construction. (Docket No. 46). The Court concurs and limits the definition consistent with their agreement.

<u>Construction</u>

---

an earlier request for reexamination, Thorley is not estopped. In its request for reexamination, Thorley contended that the Sarbaugh patent (U.S. Patent 3,993,280) invalidates claim 20 of the '609 patent because Sarbaugh's drafting stool "includes a pair of spaced apart track runways". (Docket No. 43 at Ex. 6). This is not <u>clearly</u> inconsistent with its present assertion that "guiding elements" be construed as a "set of tracks forming a predefined path which direct movement". (Docket No. 46). Additionally, in declining to apply judicial estoppel, the Court is cognizant of the different standards between litigation proceedings and reexaminations, and the Federal Circuit's limitations on claim construction judicial estoppel. *In re Swanson*, 540 F.3d at 1377; *SanDisk Corp. v. Memorex Products, Inc.,* 415 F.3d 1278, 1291-92 (Fed. Cir. 2005)(holding that a party was not judicially estopped from asserting certain claim constructions that differed from those asserted to the trial court for a preliminary injunction); *see also Fitness Quest, Inc. v. Monti,* 330 F. App'x 904, 914 (Fed. Cir. 2009).

Accordingly, the Court concludes that the construction of the term "guiding elements" is as follows:

**Guiding Elements** means "a set of tracks which direct movement."

### F. Connected Fixedly and Attached Fixedly

The parties next dispute the construction of the terms "connected fixedly" and "attached fixedly" found in claims 1 and 14.  (Docket No. 46).  The parties agree that "connected fixedly" and "attached fixedly" have the same meaning, so the Court will decide the construction of these terms together. (*Id.*).  The parties' proposed constructions are as follows:

| Term | Wonderland (Modified) [1] | | AGREED CONSTRUCTION | Thorley (Modified) [1] | |
|---|---|---|---|---|---|
| | Proposed Definition | Intrinsic Ev. | | Proposed Definition | Intrinsic Ev. |
| connected fixedly (claim 1) | ~~integrated into or joined at a set location.~~ joined or linked securely | | | separate pieces joined or linked securely to one another ~~wherein the pieces cannot move, pivot, or rotate relative to one another.~~ | Patent-in-Suit: 3:36-41; 3:57-62; 4:40-43; 4:50-55; 5:22-40; 6:15-40; claim 1. |
| attached fixedly (claim 14) | ~~integrated into or joined at a set location.~~ joined or linked securely | | | separate pieces joined or linked securely to one another ~~wherein the pieces cannot move, pivot, or rotate relative to one another.~~ | Patent-in-Suit: 3:36-41; 3:57-62; 4:40-43; 4:50-55; 5:22-40; 6:15-40. |

(Docket No. 46).

Claim 1 states: "a driving device for an infant rocking chair, the infant rocking chair including a seat body and a bottom seat, said driving device comprising: … a motor for driving said first movable member, wherein said motor includes: a motor shaft, a crank <u>connected fixedly</u> to said motor shaft at one end thereof, …"  '609 Patent col. 6. ln. 47-62; (emphasis added).  Claim 14 states: "the infant rocking chair as claimed in claim 13, wherein said second motion mechanism includes… a supporting frame attached fixedly to the bottom end of said supporting element." '609 Patent col 8. ln 18-21.

In the Revised Joint Claims Chart, the parties narrowed their dispute to whether the terms should reflect that the connection must be between two separate pieces. (Docket No. 46). Thorley first offers the definition of "connected" from Merriam Webster's Dictionary as meaning "joined or linked together," and the  definition of "connecting" as meaning "join[ing] or fasten[ing] together usually by something intervening." (Docket No. 41 at Ex. A). Thorley proffers that the '609 Patent uses "connected" only to describe two pieces being joined together, without exception.  (*Id.* at 38); (Docket No. 53 at 23); '609 Patent col. 3. ln 28-29; col. 3. ln 36-38; col 3. ln 40-42; col 4. ln 44-45.   Further, it insists that the author of the '609 Patent used "integrally" elsewhere, and thus, its exclusion from claim 1 shows the author's intent that there must be separate pieces "connected fixedly." (Docket No. 53 at 23).   Wonderland responds that Thorley incorrectly "wants the Court to hold that the term 'connected fixedly' could never be used to describe two pieces that are seamlessly joined or formed." (Docket No. 43 at 30).

The Court disagrees with Wonderland's proposed definition, especially in light of the Court's view that it has failed to provide relevant intrinsic or extrinsic evidence to support its argument.[15] *Phillips* 415 F.3d at 1317, 1319 ("we have emphasized the importance of intrinsic evidence in claim construction" and "we have also authorized district courts to rely on extrinsic evidence."…and "in weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly."). The Court also finds that the terms "connected fixedly" and "attached fixedly" imply to any person, whether of ordinary skill in the art or not,[16] that there is a connection of separate pieces and that such an understanding is supported by the evidence contained within the patent.  '609

---

[15]    Wonderland's counsel proffered analogies of the connectedness of bottle caps and the Great Lakes, which while interesting, are not relevant intrinsic or extrinsic evidence on this point. (Docket No. 51 at 27).

[16]    The parties have not agreed upon a precise definition of a person skilled in the art for this case.  (Docket No. 51 at 63).   The parties appear to tentatively agree that it would be at least someone with a mechanical engineering background. (*Id.*).

Patent col. 3. ln 28-29; col. 3. ln 36-38; col 3. ln 40-42; col 4. ln 44-45.  While one might expect agreement on the meaning of these terms, given the current parties' dispute, the Court explicitly construes the terms to reference the connection or attachment of separate pieces, as proposed by Thorley.

<u>Construction</u>

As a result, the Court concludes that the construction of the terms "connected fixedly" and "attached fixedly" are as follows:

**Connected Fixedly** means "separate pieces joined or linked securely to one another."

**Attached Fixedly** means "separate pieces joined or linked securely to one another."

## IV.     CONCLUSION

For the aforementioned reasons, the following are adopted as the proper constructions for the disputed claim terms contained within the Revised (and Corrected) Joint Disputed Claim Terms Chart. (Docket No. 46).

**Infant Rocking Chair** means "a seat or chair-like device that is designed to hold an infant and which moves or sways back and forth."

**Bottom Seat** means "a structure at the bottom of an object upon which the object sits or rests."

**Motor Shaft** means "a generally cylindrical piece that is part of the motor which rotates to transfer power from the motor."

**Crank** means "an arm attached at a right angle to a shaft which turns about the axis of the shaft."

**Guiding Elements** means "a set of tracks which direct movement."

**Connected Fixedly** means "separate pieces joined or linked securely to one another."

28

**Attached Fixedly** means "separate pieces joined or linked securely to one another."


An appropriate Order follows.


                                             _s/Nora Barry Fischer_
                                             Nora Barry Fischer
                                             United States District Judge

Date:  January 11, 2013
cc/ecf: All Counsel of Record